**The UPJOHN COMPANY, Plaintiff,**

v.

**RIAHOM CORPORATION and J.P. Utsick, Defendants.**

**Civ. A. 86–203 CMW.**

United States District Court,
D. Delaware.

Aug. 6, 1986.

Jeffrey B. Bove of Connolly, Bove, Lodge & Hutz, Wilmington, Del., for plaintiff; Thomas J. Macpeak, Peter D. Olexy, J. Frank Osha, and Cynthia Clarke Dale of Sughrue, Mion, Zinn, Macpeak & Seas, Washington, D.C., Robert A. Armitage, and Lawrence T. Welch, of Upjohn Co., Kalamazoo, Mich., of counsel.

David A. Anderson of Potter, Anderson & Corroon, Wilmington, Del., for defendants; Berj A. Terzian, Brian M. Poissant, and Victor N. Balancia of Pennie & Edmonds, New York City, of counsel.

## OPINION

CALEB M. WRIGHT, Senior Judge.

The Upjohn Company filed this lawsuit against Riahom Corp. and its president, J.P. Utsick, asserting patent infringement under 15 U.S.C. § 271, and unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), in relation to a hair treatment product defendants market. This Opinion addresses the motion for a preliminary injunction which Upjohn filed simultaneously with its complaint on May 6, 1986.

## I. BACKGROUND

### A. The Upjohn Patents

This hair-raising saga began in the late 1960's, when Upjohn was conducting clinical investigations of a compound now known generically as minoxidil.[1] At that time, Upjohn owned U.S. Patent No. 3,461,-461 ("the '461 patent"), which covered the manufacture, use and sale of minoxidil for any purpose. The '461 patent specifically disclosed the use of minoxidil for the treatment of hypertension (high blood pressure), and Upjohn eventually received approval

---

1. The full chemical name of minoxidil, as set forth in Upjohn's patent, is 6–amino–1, 2–dihydro–1–hydroxy–2–imino–4–piperidinopyrimidine. It is also known as 2,4–diamino–6–piperidine–pyrimidine–3–oxide, as set forth on the package for defendants' product. *See* Appendix to Plaintiff's Reply Brief A–1481, Docket No. 31C.

Both sides have submitted lengthy appendices. Subsequent references to plaintiff's appendix will be designated "A–_____." Defendants' appendix will be cited as "DA–_____."

from the Food & Drug Administration ("FDA") to market LONITEN tablets, a prescription antihypertensive drug product containing minoxidil. The '461 patent expired on May 7, 1985.

In 1968–71, Dr. Charles Chidsey, a cardiologist at the University of Colorado Medical School, conducted clinical investigations relating to the effects of oral administration of LONITEN to treat hypertension. Chidsey was a contract consultant to Upjohn who was obligated under his contract to assign to Upjohn any inventions arising out of experimental work that Upjohn sponsored. During these investigations, Chidsey observed that LONITEN, as a side effect in some patients, caused hirsutism, or the growth of excess facial and body hair. He consulted in April 1971 with two dermatologists at the medical school, Drs. Guinter Kahn and Paul Grant, about the excess hair growth. Shortly thereafter, Kahn proposed to Grant the idea of applying minoxidil topically to promote hair growth. The two obtained a small amount of minoxidil to be used in human experiments. Kahn and Grant applied a minoxidil solution locally to themselves and two other volunteers for roughly two months, at the end of which period three of the four participants showed a marked increase in the thickness of hair at the test site. As a result of these tests, Grant and Kahn concluded that topical application of minoxidil did cause an increase in growth (both length and thickness) in human hair. Chidsey did not know that the experiments were taking place until after their completion. Kahn and Grant disclosed the results of this experimental work to Upjohn and met with Upjohn representatives in Kalamazoo, Michigan, in December 1971 to discuss Upjohn's continuing support for this research and remuneration for informing Upjohn of their observations.[2] Following the meeting with Grant and Kahn, Upjohn informed the FDA of the experiment to protect its pending New Drug Application for LONITEN. (DA–191).

On December 29, 1971, after getting an assignment from Chidsey, Upjohn filed a patent application naming Chidsey as sole inventor of an invention using the topical application of minoxidil to grow hair. The Patent and Trademark Office ("PTO") rejected all claims for the application under 35 U.S.C. § 101 for failure to demonstrate proof of utility for growing hair. Upjohn filed three continuation applications, each of which was rejected for failure to provide clinical proof of utility. Upjohn presented acceptable clinical evidence in 1978 in a subsequent continuation application, and on February 13, 1979, was issued U.S. Patent No. 4,139,619 ("the '619 patent") covering the topical application of minoxidil compounds to stimulate hair growth. (A–161–70).

The '619 patent makes three categories of claims: (a) product claims to a topical composition of minoxidil free-base or its salts to be applied to mammalian skin (Claims 1–3); (b) process claims for increasing the rate of growth of terminal hair by use of the topical composition (Claims 4–6); and (c) process claims for converting vellus hair to growth as terminal hair through use of the topical composition (Claims 7–9).[3] The claims cover a minoxidil compound in association with a topical pharmaceutical carrier from the group consisting of ointments, lotions, pastes, jellies, sprays, aerosols (Claim 1), and included concentrations of the minoxidil compound from about 0.1% to about 20% of the topical composition (Claims 2, 5, 8). The claims also specify that the topical composition must contain "an effective amount" of the minoxidil compound (Claims 1, 4, 7).

---

2. Unlike Chidsey, Grant and Kahn did not have a contractual consulting arrangement with Upjohn and had no obligation to assign any inventions arising from their work to Upjohn. In fact, Grant and Kahn did not have authorization from Upjohn to use its patented compound in any fashion.

3. Terminal hair is the coarse hair growing on certain areas of the body during adult years. Vellus hair is the soft downy hair which covers most of the body. Darland's Illustrated Medical Dictionary 577, 1442 (26th ed. 1981).

In May 1974, Kahn and Grant filed a patent application, U.S. Patent Application No. 181,959, directed to the topical use of minoxidil compounds to stimulate hair growth. After the '619 patent issued, the PTO placed it in interference with the Kahn/Grant application, Interference No. 101,184. Following negotiations, the opposing sides filed sworn statements of pertinent facts from all parties with the PTO to allow resolution of the interference. The parties also took the position that the proper inventorship of the subject matter of the patent should include Kahn as well as Chidsey, and that Grant was not a co-inventor of the subject matter.[4] The PTO concluded that Chidsey and Kahn were properly designated as inventors of the '619 patent, originally filed solely in Chidsey's name, and that Kahn and Chidsey were joint inventors of the interfering application originally filed in the names of Kahn and Grant. Papers were filed to correct the inventorship for both the '619 patent and the interfering application. The interference was then settled, with Upjohn paying some consideration to each of the putative inventors. (A-1552). U.S. Patent No. 4,596,812 ("the '812 patent"), based on the formerly interfering Kahn/Grant application, issued to Chidsey and Kahn on June 24, 1986. (A-1544-48).[5]

Based on the subject matter of the '619 patent, Upjohn has been preparing to market a prescription drug product called RE-GAINE, a topical solution for the treatment of baldness. Under the Federal Food, Drug & Cosmetic Act, 21 U.S.C. § 355, no drug product lawfully may be sold in interstate commerce without prior FDA approval. Approval of a new drug or a new indication for a previously approved drug requires submission to the FDA of substantial scientific evidence and detailed clinical evaluations to assure the product's safety and efficacy for the proposed use. FDA approval of a New Drug Application ("NDA") is limited to the company making the application and to the purposes specifically approved by the FDA. Upjohn submitted a NDA for REGAINE on December 19, 1985. The NDA was based on at least eight years of developmental work including human clinical studies, animal studies and related scientific studies; Upjohn spent approximately $25 million over the last three years for clinical studies. (A-17, 32).

Although the FDA has not approved its NDA for REGAINE, Upjohn is now spending $35 million for plant and equipment for its commercial production. The company, as well as outside analysts, expect the market for REGAINE to be very substantial. (A-49, 53-78). Upjohn will satisfy this demand from its own facilities and will not issue licenses under the '619 patent. (A-152).

### b. Rivixil and Riahom

Defendants' hair treatment product, RI-VIXIL, was developed by Kemyos Bio Medical Research, of Binasco, Italy. Kemyos filed two patent applications in Italy in 1984 covering minoxidil compounds used for the stimulation of hair growth and treatment of baldness. It is unclear whether any patent has issued from either application. (A-371). Kemyos prepares RIVIX-IL by adding a salt of minoxidil (iminoxapril carbocysteinate), which it calls "SKM005", to a liquid vehicle of water and propylene glycol.[6] The concentration of minoxidil in the solution is approximately 0.9%. The product is sold in a package containing sixty vials of the solution and a bottle of special shampoo to be used in

---

4. The joint memorandum submitted by the parties also took the alternative positions that either Kahn or Chidsey should be designated as sole inventor. (DA-213-19).

5. The '812 patent is not involved in the pending preliminary injunction motion, although Upjohn plans to amend its complaint to allege infringement of that patent. Plaintiff's Reply Brief, at 1 n. 1, Docket No. 31.

6. The SKM005 molecule is a combination of the basic minoxidil compound and carboxymethyl-cisteine. This latter substance has a structure similar to keratin, the chief component of hair. See Defendants' Submission in Support of Oral Arguments, tabs 1-2, Docket No. 40.

conjunction with the solution. Kemyos advertises RIVIXIL as a cosmetic treatment for baldness which attempts to prevent or retard hair loss. (A–1061–66).[7]

Defendant Utsick saw RIVIXIL when travelling in Italy in 1985 and purchased a package of it for more than $100. (A–265–67). Utsick purchased RIVIXIL because the package indicated that it contained "carbocisteine of minoxidil", and he was aware of Upjohn's intention to market a minoxidil product to enhance hair growth. (A–265–66). Utsick used RIVIXIL in hopes that it would grow hair on his head (A–268), but it did not. (A–266). Utsick's hair evidently became thicker and fuller through his use of the shampoo. (A–272–73). Utsick met with Kemyos officials and eventually negotiated an agreement in March 1986 giving defendant Riahom Corp.[8] the exclusive right to market and sell RIVIXIL in the United States. (A–516–21).

Riahom buys RIVIXIL concentrate from Kemyos in Italy, ships it to New York, and then transfers it to J. Coburn, Inc., an independent custom packager in Florida, which reformulates the concentrate and packages it for sale. Riahom markets RIVIXIL to hair salons and other independent dealers through regional sales managers, who solicit orders. A national sales manager supervises the activities of the regional sales managers. These regional managers forward sales orders they have solicited to Riahom headquarters in New York, which provides shipping instructions to J. Coburn, Inc. in Florida, which then ships RIVIXIL to customers. (A–512–13; DA–2). Riahom has exhibited at various hair care industry trade shows where it promoted RIVIXIL with booth displays, brochures, videotapes, and other forms of publicity. (A–1–2, 41–42, 80–149).

RIVIXIL, as originally marketed in the United States, was prepared in Florida according to a formula provided by Kemyos (A–289), and contained at least 0.87% of the minoxidil salt. (A–289). A RIVIXIL kit contains four vials of RIVIXIL liquid, a container of RIVIXIL shampoo, and an insert giving directions of use and applications. (A–83–84). The retail price for a kit containing a 60–day supply of RIVIXIL is $150. (A–287).

Although Kemyos and several Italian universities conducted tests in Italy to determine the safety of RIVIXIL, Riahom has spent no funds on safety and efficacy testing for RIVIXIL in the United States and knows of no tests conducted in this country. (A–373–74). Riahom conducts no quality control procedures on RIVIXIL. (A–361–62). The independent packager in Florida conducts certain quality checks, but Riahom did not select the procedures and evidently does not know what they are. (A–360–61).

Riahom is marketing RIVIXIL as a cosmetic, rather than a drug, so that they have not submitted the product to the FDA for testing and approval.[9] The original advertising brochures for RIVIXIL described it as "Europe's Answer to Minoxidil". (A–477–78, 480, 1171, 1180). The brochures, among other things, stated that RIVIXIL contained "the patent molecule 'SKM005'" and "has been tested in many European universities and the tests conclude that it is non-toxic and safe to use." (A–147). The brochure also stated that RIVIXIL is "[a]

---

7. The Italian health ministry on April 12, 1986, issued a decree prohibiting the sale as "cosmetics" of compounds containing minoxidil or its salts and analogues, and withdrawing all such products already on the market. (A–172–79). According to defendants' counsel, Kemyos has appealed this decree.

8. Riahom was incorporated in Delaware in March 1986, and its headquarters are in New York. It had previously been incorporated in Delaware as Riahom Ltd., Inc., and in New York as Riahom Limited.

9. Under the Food, Drug, and Cosmetic Act, a "drug" is an article "intended to affect the structure or any function of the body of man," while a "cosmetic" is an article intended to be applied to the human body "for cleansing, beautifying, promoting attractiveness, or altering the appearance." 21 U.S.C. § 321(g), (i). An FDS drug study bulletin issued April 10, 1986, stated that promotion of minoxidil compounds for hair growth violated the new drug and misbranding provisions of the Act. (A–179–80).

## 1216

product proven safe and easy for your clients to use" and is "[a] product that has the most 'pre-sale' publicity of any hair product ever including coverage on 20/20 (TV) and articles in *People Magazine, Newsweek, Time, Esquire, Science Digest* and all major European publications." (A–147).

An Upjohn employee posing as a hair salon operator visited the Riahom/RIVIXIL exhibit at the All-Texas Beauty Show on April 7, 1986. Among the materials he received at the exhibit are the brochure described above and a letter from defendant Utsick to salon owners. The letter related how Utsick had seen in Italy a RIVIXIL package listing a minoxidil compound among the ingredients. Utsick's letter then stated: "[F]rom all the press generated in the United States about Minoxidil, I knew Minoxidil grew hair!!! About *two-thirds* of those tested in the United States grew hair to varying degrees of satisfaction. Well, any product that had that kind of proven record was worth a try for me, because the top of my head is 'losing it' very rapidly." (A–101).[10] Attached to the letter were numerous articles from such publications as *People Magazine, Newsweek,* and *Esquire* referring to minoxidil and Upjohn. (A–121–37). A television monitor at the exhibit showed a videotape of a "20/20" broadcast relating to Upjohn and the use of minoxidil in treating persons with baldness. (A–82).

### c. Upjohn and Riahom

On March 17, 1986, Upjohn's counsel sent Riahom a letter stating that Riahom's alleged advertisement and promotion of a minoxidil product to promote hair growth infringed the '619 patent owned by Upjohn and asking Riahom to stop these practices. (A–187–88). Following receipt of this letter, and after discussing the matter with counsel, Riahom made several changes regarding the marketing and composition of

RIVIXIL. The concentration of the minoxidil salt in RIVIXIL supposedly was reduced from about 0.87% to less than 0.7% (DA–2; A–289), to ensure that RIVIXIL did not promote the growth of hair. (DA–2; A–291). In addition, Utsick allegedly instructed Riahom's sales staff "to stop making any reference at all to Upjohn or minoxidil." (A–316). The regional sales managers were instructed to replace the phrase "Europe's Answer to Minoxidil" with "See Your Hair Reborn" in advertising, (A–1057), to stop using a European RIVIXIL ad which suggested that the product grew hair (A–141–42, 1167), and to stop using the letter from Utsick to salon owners discussed above. (A–1169). Riahom prepared new promotional materials for RIVIXIL reflecting these changes (A–480), which occurred in early April 1986. (A–290, 315).

The changes made by Riahom apparently were not totally effective, however. One of defendants' independent dealers sold a product containing 0.89% minoxidil on June 21, 1986. (A–1462–64, 1542–43). As of June 21, 1986, at least one of defendants' independent dealers was telling prospective customers that RIVIXIL grew hair (A–1459–61), distributing brochures which touted RIVIXIL as a hair growth product (A–1469–72), and handing out copies of newspaper articles about minoxidil, Upjohn, and the treatment of baldness. (A–1473–78). A sales presentation memorandum prepared for the regional sales managers on April 21, 1986, advised them to describe RIVIXIL as "Europe's Answer to Minoxidil." (A–1692–93). An "Independent Dealer Information Manual" for RIVIXIL, prepared and distributed in early May 1986, contained statements about a U.S.-produced minoxidil product which promotes "a fuller, thicker head of hair." (A–1039). A RIVIXIL marketing plan prepared in March 1986 contained identical statements, (A–103), which Utsick has admitted refer to Upjohn. (A–432–33). A

---

**10.** The letter also stated that Riahom "is 'mo hair' spelled backwards." (A–101). A Riahom marketing plan distributed at the show stated that SKM005 is "the 'salt' of a product produced in the United States. . . . The product produced

in the United States is the *only* substance which has proven in many scientific tests to dramatically improve the appearance of the scalp by promoting a fuller, thicker head of hair." (A–103).

May 5, 1986, letter from Riahom's national sales manager to its regional sales managers told them to "capitalize upon" and include in their presentation packs articles about the price increase of Upjohn stock caused by news of the favorable results of minoxidil testing. (A–1714).

## II. PATENT INFRINGEMENT

### a. General Standards

■ Relevant decisions of the Federal Circuit set forth the following standards for issuance of a preliminary injunction in a patent infringement case:

(1) a reasonable likelihood of success on the merits regarding the patent's validity and the fact of infringement;

(2) the threat of irreparable injury in the absence of injunctive relief;

(3) the balance of hardships favors relief;

(4) the public interest favors relief.

*Roper Corp. v. Litton Systems, Inc.*, 757 F.2d 1266, 1272 n. 5 (Fed.Cir.1985); *Datascope Corp. v. Kontron, Inc.*, 786 F.2d 398 (Fed.Cir.1986).

■ If a patentee makes a "clear showing" that his patent is valid and infringed, irreparable injury is presumed. *Smith Int'l., Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed.Cir), *cert. denied*, 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983); *Roper Corp.*, 757 F.2d at 1271. If the patentee does not make such a "clear showing", but can establish only a reasonable likelihood of success on the merits, then he also must make a separate showing of irreparable injury. *Roper*, 757 F.2d at 1272 n. 5; *Datascope*, 786 F.2d at 400. Each of the four factors must be considered and weighed against each other. *Roper*, 757 F.2d at 1269 n. 2.

### b. The Parties' Positions

Upjohn argues that the validity of the '619 patent is shown by the pioneering nature of the patent, its clear compliance with the criteria of patent validity under the statute, the careful scrutiny given the patent application by the PTO, and the acqui-

escence of other potential infringers to Upjohn's patent rights. Defendants' infringement of the '619 patent is established by their own admission that RIVIXIL contains a minoxidil salt and by scientific tests of the composition of RIVIXIL. Upjohn claims irreparable injury based on the facts that defendants' activities will deny Upjohn the full advantage of its patented discovery, defendants will be unable to compensate Upjohn in the future for any loss, and the possible lack of efficacy or dangerous effects of defendants' product will prejudice the market against Upjohn's RE-GAINE. Upjohn also argues that the public interest favors a grant of preliminary relief, because defendants are selling as a "cosmetic" a product which regulatory authorities consider to be a prescription "drug."

Defendants' arguments rebut Upjohn at each step. They argue that serious questions exist about the validity of the '619 patent because Upjohn deceptively designated the inventorship of the process, failed to disclose to the PTO a previously published article about another hypertension drug which produced hirsutism as a side effect, and delayed the prosecution of the '619 patent by ignoring clinical studies available from Grant and Kahn about the utility of using minoxidil to grow hair.

Although admitting RIVIXIL contains a minoxidil salt, defendants claim not to be infringing the '619 patent for several reasons. Most importantly, defendants argue that RIVIXIL does not contain a high enough concentration of minoxidil to promote hair growth and that the claims of the '619 patent are limited to compositions containing enough minoxidil to promote hair growth. The low concentration of minoxidil found in RIVIXIL only is sufficient to improve the appearance of hair cosmetically. Second, defendants argue that Upjohn's patent does not cover minoxidil in liquid carriers, such as the deionized water/propylene glycol mixture used in RIVIXIL. Finally, defendants argue that the particular minoxidil salt and liquid carrier used in RIVIXIL have never been tested

for their potential to promote hair growth, so that no proof exists that RIVIXIL grows hair.

Regarding irreparable harm, defendants argue that Upjohn's allegations of irreparable harm are based solely on the assumption that RIVIXIL contains enough minoxidil to grow hair, which it does not. As for the balance of equities, Riahom points out that enjoining sale of RIVIXIL would put it out of business and that denying Upjohn's request for a preliminary injunction would have no effect on its business because REGAINE currently is not on the market.

The Court, with reluctance, concludes that it must deny Upjohn's request for preliminary injunctive relief for patent infringement. This conclusion is based primarily on Upjohn's failure to convince the Court that it has a reasonable likelihood of success on the merits regarding patent validity and infringement.

### c. Discussion

#### (1) Validity

■ A patent holder seeking a preliminary injunction can make a sufficient showing of patent validity in three ways: a prior adjudication of the validity of the patent, public acquiescence to its validity, or direct technical evidence proving its validity. *Smith Int'l., Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1578 (Fed.Cir.1983); *Eli Lilly & Co. v. Premo Pharmaceutical Labs., Inc.,* 630 F.2d 120, 136 (3d Cir.), *cert. denied,* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980).[11] Upjohn admits that there has been no adjudication of the validity of the '619 patent. Regarding public acquiescence, Upjohn has submitted an affidavit stating that some parties had contacted it

about obtaining a license under the '619 patent and that some parties stopped promoting topical minoxidil compositions for the treatment of baldness after Upjohn informed them of its patent rights. (A–151). Upjohn does not seek to rely on these actions alone as sufficient proof of the validity of the '619 patent, but rather relies on them in conjunction with other evidence to establish its validity.

■ The Court agrees that the industry acquiescence evidence submitted is insufficient by itself to establish patent validity for the granting of a preliminary injunction. As a general matter, the public acquiescence needed to sustain validity must be long-standing, *see e.g., Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.,* 443 F.2d 867, 871 (2d Cir.1971), *cert. denied,* 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156 (1973). The '619 patent issued only seven years ago. In addition, Upjohn's REGAINE product has not yet been manufactured and placed on the market for public sale, so that the pharmaceutical manufacturing industry cannot be said to have conceded validity. *See, e.g., Rohm & Haas Co. v. Mobil Oil Corp.,* 525 F.Supp. 1298, 1303 (D.Del.1981). Finally, the affidavit submitted by Upjohn is quite enigmatic and does not provide enough information about the license requests and cessations of infringement for the Court to determine if any meaningful acquiescence occurred.

Upjohn's chief argument in favor of the validity of the '619 patent is that direct technical evidence shows that it has met the statutory requirements for patentability. Upjohn claims that the pioneering sta-

---

11. Upjohn claims that injunctive relief may be proper in other circumstances, even when the patent holder cannot show validity through a prior adjudication, public acquiescence or direct technical evidence, relying on *Packard Paper Box Co. v. O.B. Andrews Co.,* 67 F.2d 783 (1st Cir.1933), and *White v. Leanore Frocks, Inc.,* 120 F.2d 113 (2d Cir.1941). The Court does not believe that preliminary injunctive relief is proper when the patent holder cannot dispel sufficiently any doubts as to the validity of the patent. As far as this Court is aware, the Feder-

al Circuit has never endorsed issuance of a preliminary injunction based on such "other circumstances." In fact, the Second Circuit, in *Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.,* 443 F.2d 867, 871–72 (2d Cir.1971), effectively repudiated the *White* decision. *See Bose Corp. v. Linear Design Labs,* 467 F.2d 304, 307 (2d Cir.1972) (discussing *White* and *Carter-Wallace* ); *see also* 5 D. Chisum, Patents § 20.-04[iv] (1986) (discussing case law on "exceptional circumstances").

tus of the invention and its long and extensive consideration by the Patent Office bolster the technical evidence of the patent's validity.

The Court declines, at this preliminary stage, to make a finding that the '619 patent meets all the statutory requirements for patentability. The record is sparsely developed at this point, and the Court has only the bald assertions of Upjohn that it met the statutory requirements for novelty, non-obviousness, etc., on which to base any findings. The cases cited by Upjohn in which the court found that the validity of the patent had been established, for preliminary injunction purposes, by direct technical evidence all involved situations where extensive development of evidence already had occurred. *See Eli Lilly & Co. v. Premo Pharmaceutical Labs.*, 630 F.Supp. 120, 122 (3d Cir.1980) (preliminary injunction issued after several months of discovery and extensive hearing); *Teledyne Indus. v. Windmere Products, Inc.*, 433 F.Supp. 710, 713 (S.D.Fla.1977) (preliminary injunction issued after numerous hearings on validity held and extensive technical evidence presented); *Medtronic, Inc. v. Daig Corp.*, 221 U.S.P.Q. 595, 597 (D.Minn.1983) (preliminary injunction issued after extensive two week hearing), *aff'd.*, 789 F.2d 903 (Fed.Cir.1986); *cf. Rohm & Haas Co.*, 525 F.Supp. at 1305 (court could not evaluate validity of patent without assistance of expert testimony and full hearing amounting to mini-trial on merits).

The pioneer status of the patent and its long consideration by the PTO are simply beside the point. The Court, and not one of the parties, will make the determination whether the '619 patent is entitled to pioneer status. In addition, Upjohn has failed to explain how, as a matter of law, the pioneer status of a patent helps to establish its validity. Similarly, the Court does not understand why the extensive consideration given the '619 patent by the PTO somehow entitles the patent to a greater presumption of validity than that accorded the run-of-the-mill patent under 35 U.S.C. § 282.

The Court's conclusion that Upjohn has not made a reasonable showing of the validity of the '619 patent at this preliminary stage does not mean that the Court has found any of the invalidity arguments advanced by defendants particularly convincing. It is based simply on Upjohn's failure to present sufficient technical evidence to support any findings that the statutory requirements for patentability have been met.

*(ii) Infringement*

Determination of infringement involves three steps: (1) interpreting the language of the patent claims; (2) assessing the nature of the accused infringer's acts; and (3) applying the claims as construed to those acts. 5 D.Chisum, *supra*, § 20.-04[1][d], at 20–288; *see also Roper Corp. v. Litton Systems, Inc.*, 757 F.2d 1266, 1270–71 (Fed.Cir.1985).

Applying this standard to the '619 patent, the claims can be separated into three types: (1) product claims for a topical composition containing "an effective amount" of a minoxidil compound to be applied to mammalian skin (Claims 1–3); (2) process claims for increasing the rate of terminal hair growth through topical application of an effective amount of a minoxidil compound (Claims 4–6); and (3) process claims for converting vellus hair to growth as terminal hair through topical application of an effective amount of a minoxidil compound (Claims 7–9). The claims do not specify what is meant by the phrase "an effective amount" of a minoxidil compound, but the Court construes it at this preliminary stage as requiring that the composition contain enough of the minoxidil compound to produce the process results covered by the patent—i.e., to promote growth of terminal hair and/or conversion of vellus hair into terminal hair.

Defendants do not dispute that RIVIXIL is a topical composition containing a minoxidil compound to be applied to mammalian skin. They claim not to be infringing the '619 patent for two reasons, however. First, RIVIXIL does not fall within the

patent claims relating to growth or conversion of hair because it does not promote hair growth; it only promotes "a fuller, thicker head of hair." Second, RIVIXIL does not fall within any of the patent claims because it does not contain "an effective amount" of a minoxidil compound to promote hair growth.

Upjohn relies on the following pieces of evidence to argue that RIVIXIL grows hair, regardless of the limitations defendants claim for their product: (1) various advertising and promotional materials for RIVIXIL, including statements made by RIVIXIL salesmen and materials which refer to Upjohn and minoxidil; (2) Kemyos' Italian patent applications for SKM005, which describe it as a hair growth agent; (3) Kemyos' Italian promotional and advertising materials, which state that RIVIXIL promotes hair growth; and (4) the Italian Health Ministry decree prohibiting the sale of minoxidil compounds as cosmetics to promote hair growth. In addition, Upjohn argues that the '619 patent is a pioneer patent entitled to a broad range of equivalents, including promotion of a fuller, thicker head of hair.

■ The Court has reviewed the record with a fine-toothed comb but cannot conclude at this point that RIVIXIL infringes the '619 patent because Upjohn has presented no direct proof that use of RIVIXIL promotes hair growth. The Court construes the '619 patent to cover only topical compositions containing a sufficient amount of a minoxidil compound to promote the growth or conversion of hair, so that such proof is necessary for a finding of infringement.

■ For the most part, Riahom's advertising and promotional materials for RIVIXIL cagily avoid any direct statement that RIVIXIL promotes hair growth (although the clear inference is that it does). Even assuming, however, that Riahom's advertisements explicitly asserted that RI-

VIXIL could grow hair on the baldest of pates, the Court cannot find infringement if there is no proof that the product has any of the claimed effects. If patent claims embody a particular effect as well as efficacy in achieving that effect, then infringement of those claims necessarily requires that the infringing product produce that effect. Misleading statements about what a product does, in the absence of proven efficacy, are the concern of laws prohibiting unfair competition, not the patent laws.

Upjohn cites a number of cases for the proposition that infringement still occurs where a party imperfectly utilizes a patent for the purpose of avoiding infringement, while enjoying the benefits of the patent's teachings. *See e.g., Parkson Corp. v. Proto Circuits, Inc.,* 220 U.S.P.Q. 898, 911 (D.Md.1983); *AMI Industries v. EA Industries,* 204 U.S.P.Q. 568, 590 (W.D.N.C. 1979), *aff'd.,* 644 F.2d 876 (4th Cir.), *cert. denied,* 454 U.S. 952, 102 S.Ct. 490, 70 L.Ed.2d 258 (1981); *La Maur, Inc. v. L.S. Donaldson Co.,* 190 F.Supp. 771, 778 (D.Minn.1961), *aff'd in part,* 299 F.2d 412 (8th Cir.), *cert. denied,* 371 U.S. 815, 83 S.Ct. 27, 9 L.Ed.2d 57 (1962). Those cases each involved situations where the infringer, although modifying the patent claims, retained the essence or principle of the invention. In contrast, the '619 patent covers only topical minoxidil compositions effective to promote hair growth. If RIVIXIL does not promote hair growth, then it does not contain the essence of the '619 patent.[12]

Kemyos' Italian patent applications for SKM005 also do not provide direct evidence that RIVIXIL grows hair. The applications explicitly claim that the covered minoxidil compounds stimulate "the normal new hair growth cycle" (A–1113) and can be used "for the growth of hair and for the treatment of alopecia [baldness]" (A–1162). However, the Court does not know wheth-

**12.** *University of Illinois Found. v. Block Drug Co.,* 133 F.Supp. 580 (E.D.Ill.1955), *aff'd.,* 241 F.2d 6 (7th Cir.), *cert. denied,* 354 U.S. 922, 77 S.Ct. 1382, 1 L.Ed.2d 1437 (1957), on which Upjohn relies, is distinguishable. In that case, there was ample direct evidence of infringement in addition to defendant's appropriation of publicity about plaintiff's product.

er, and to what extent, the Italian patent officials require proof of such claims, and, as a result, whether Kemyos could substantiate them.

The promotional materials for RIVIXIL distributed by Kemyos in Italy clearly claim that the product is effective for the treatment of baldness. There is no proof before the Court, however, that RIVIXIL actually has this effect. All of the Italian studies in the record tested for possible side effects of RIVIXIL; none tested RIVIXIL's ability to grow hair. (A–622–966).[13]

■ Finally, the Italian Health Ministry decree is simply beside the point. The decree prohibits the sale of minoxidil compounds as cosmetics to promote hair growth; it says nothing about the efficacy of RIVIXIL or any other product to promote such growth. In fact, the decree states that minoxidil is effective for the treatment of baldness only in strengths between two percent and five percent. (A–174).[14]

The infringement evidence in the record is almost entirely circumstantial. The RIVIXIL promotional materials leave the strong inference that the product promotes hair growth (and thus infringes the '619 patent); the Court would be naive not to recognize that. However, in the absence of any evidence directly showing that RIVIXIL grows hair, the Court cannot find that Upjohn has made a sufficient showing of likely success on the issue of infringement to support issuance of a preliminary injunction.

#### (iii) Irreparable Injury, Balance of Equities and Public Interest

The Court does not find that Upjohn will be harmed irreparably if no preliminary injunction issues. There is no proof before the Court showing that defendants are infringing on the '619 patent, and Upjohn does yet not have its REGAINE product on the market. Any injury to Upjohn at this point is speculative.

The balance of equities favors defendants. Issuance of a preliminary injunction against the sale of RIVIXIL presumably would put Riahom out of business. On the other hand, if no injunction issues, Upjohn will be in approximately the same position as it is now. Only the public interest factor counsels in favor of granting a preliminary injunction. As will be discussed more fully below, defendants are marketing as a cosmetic a product which the Court suspects might well be classed as a drug by appropriate regulatory authorities. Such a reckless practice does not promote the public interest.

■ Weighing the four factors of the test against each other, the Court finds that it cannot issue a preliminary injunction against defendants for patent infringement.

### III. UNFAIR COMPETITION

#### A. General Standards

■ Section 43(a) of the Lanham Act provides that:

Any person who shall ... use in connection with any goods or services ... any false description or representation, including words or other symbols tending falsely to describe or represent the same ... shall be liable in a civil action by any person ... who believes that he is or is likely to be damaged by the use of such false description or representation.

15 U.S.C. § 1125(a). The standards for granting a preliminary injunction under the

---

**13.** A Kemyos official interviewed in an Italian newspaper stated that 55% of balding persons treated with RIVIXIL attained positive results, 10–15% attained partially satisfactory results, and 30% attained unsatisfactory results. *See* A–1060–67. The Court does not have before it the results of this testing.

**14.** Upjohn's allegation that the '619 patent is a pioneer patent is irrelevant. The Court will make the determination whether the patent deserves pioneer status, but it first must determine that the patent is valid. *See Studiengesellschaft Kohle mbH v. Dart Indus.,* 549 F.Supp. 716 (D.Del.1982) (finding patent valid prior to finding that it deserves pioneer status), *aff'd.,* 726 F.2d 724 (Fed.Cir.1984).

Lanham Act are similar to those used in patent cases. The movant must show that it has a reasonable likelihood of success on the merits; it may suffer irreparable injury without injunctive relief; the balance of equities favors relief; and the public interest favors relief. *SK & F Co. v. Premo Pharmaceutical Labs.*, 625 F.2d 1055, 1066–68 (3d Cir.1980).

*b. Discussion*

*(i) Likelihood of Success*

Upjohn has separated defendants' alleged Lanham Act violations into two groups: defendants' false claims about RIVIXIL, and their use of publicity about Upjohn and its product REGAINE to promote RIVIXIL.

█ It is well established that a person's use of a picture or other depiction of a competitor's product to sell his own product violates § 43(a). *E.g., L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.*, 214 F.2d 649 (3d Cir.1954); *Sublime Products, Inc. v. Gerber Products, Inc.*, 579 F.Supp. 248 (S.D.N.Y.1984); *Elnicky Enterprises, Inc. v. Spotlight Presents, Inc.*, 213 U.S.P.Q. 855 (S.D.N.Y.1981) (enjoining defendant's use of videotape depicting plaintiff's product). In such situations, unfair competition exists because the defendant unfairly seeks to trade on the plaintiff's reputation and goodwill by representing plaintiff's product as his own or by creating the false impression that some association exists between the two products or their sources.

In promoting the sale of RIVIXIL, defendants have made extensive use of materials relating to Upjohn and its research on minoxidil as a treatment for baldness. For example, they have exhibited at trade shows a videotape of a "20/20" television program on REGAINE and made use of numerous articles regarding Upjohn, REGAINE, and minoxidil research which have appeared in a variety of periodicals. None of these materials refer to Riahom and RIVIXIL. Defendants also have utilized the slogan "Europe's Answer to Minoxidil"

in advertising. Some of these practices continued even after Utsick allegedly ordered them to cease.

█ Such practices clearly violate the Lanham Act. Defendants' use of periodical articles and videotapes about Upjohn and REGAINE plainly suggests that the publicity refers to defendants' product. Use of the slogan "Europe's Answer to Minoxidil" also wrongly attempts to trade on the publicity surrounding Upjohn's research and product.[15] These materials tend to confuse the public by wrongly suggesting that some relationship exists between Upjohn and RIVIXIL. The Court finds a substantial likelihood that Upjohn will succeed on the merits in relation to these practices.

Upjohn also seeks to enjoin defendants from making allegedly false claims in its advertising of RIVIXIL. These claims essentially fall into four categories: (1) that RIVIXIL is a "cosmetic"; (2) that RIVIXIL or SKM005 is "patented" or "patented in Europe"; (3) that RIVIXIL has been clinically and medically tested and found safe to use; and (4) that RIVIXIL promotes hair growth or retards baldness.

█ Section 43(a) clearly encompasses false and misleading statements in advertising and promoting a company's products. When the challenged claim is literally false, the court may grant relief without considering the impression that the advertising may have created on the buying public. *Coca-Cola Co. v. Tropicana Prod., Inc.*, 690 F.2d 312, 317 (2d Cir.1982); *American Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160, 165 (2d Cir.1978). When the challenged advertisement is literally true, but creates a deceptive impression about the product, the Court must find that the ad has a tendency to deceive the consumer and that the deceptive statement is likely to influence the purchasing decision. *Vidal Sassoon, Inc. v. Bristol-Meyers Co.*, 661 F.2d 272, 277–78 (2d Cir.1981); *Toro*

---

**15.** The slogan also is misleading. It suggests that RIVIXIL is somehow distinguishable from minoxidil products. Minoxidil is one of the key ingredients in RIVIXIL.

*Co. v. Textron, Inc.*, 499 F.Supp. 241, 251 (D.Del.1980).

### a. COSMETIC

Defendants consistently claim in their advertising and promotional literature that RIVIXIL is a "cosmetic." (A–80–81, 94, 103, 139; DA–2). This claim may be literally false. Both the FDA and Italian regulatory authorities have determined that any minoxidil compound promoted for hair growth is a drug, rather than a cosmetic. (A–172–80). Defendants seek to escape this characterization by arguing that RIVIXIL, although containing minoxidil, does not promote hair growth so that it is a cosmetic.

As outlined in the earlier discussion of patent infringement, this Court has no direct proof that RIVIXIL promotes hair growth. There is a possibility, however, that RIVIXIL, if tested, may be shown to promote hair growth. Defendants have never tested RIVIXIL to determine its lack of efficacy for hair growth and thus have no basis to claim it is a cosmetic. Their characterization of RIVIXIL as a cosmetic therefore creates a deceptive impression about the product—regardless of its truth or falsity.

The Court finds that the claim has a tendency to deceive the consumer and is likely to influence the purchasing decision. Cosmetics are widely available for sale. If tests show RIVIXIL to be a drug, it would be unavailable for lawful sale except by physician's prescription. The necessity of getting a prescription definitely would influence a person's decision to purchase the product.

### b. PATENTED

Defendants' promotional materials state that RIVIXIL and/or SKM005 is patented. (A–93, 103). Defendants do not claim that RIVIXIL and SKM005 are patented in the United States. Although Kemyos has filed two patent applications for minoxidil compounds in Italy, the Court has no evidence that a patent has resulted from the applications, and defendants do not claim that Kemyos has a patent. Even if a patent issued in Italy, there is no record of such a patent in the United States. Defendants' unqualified statement that their product is patented, when made to the American public in the United States, leaves the clear implication that RIVIXIL is patented in this country. It is possible that defendants' promotional materials allude to Upjohn's patents, but they contain no such acknowledgement.

██ False or misleading claims of patent protection clearly violate § 43(a). *See John Wright, Inc. v. Casper Corp.*, 419 F.Supp. 292, 327 (E.D.Pa.1976) (false claims that penny banks were patented constituted material misrepresentation of quality which tended to deceive ordinary purchaser), *modified on other grounds*, 587 F.2d 602 (3d Cir.1978); *In re Uranium Antitrust Litigation*, 473 F.Supp. 393, 408 (N.D.Ill.1979) (seller who exaggerates scope of patents, giving false impression that it is exclusive source of product, violates § 43(a)).

### c. CLINICALLY TESTED AND SAFE

Defendants' promotional materials state that RIVIXIL has been clinically tested and shown safe for use. (A–93–94, 105, 144). Upjohn does not dispute that RIVIXIL may have been subjected to clinical testing; indeed, the Court received copies of a number of tests conducted in Italy. Upjohn does object to defendants' claims that those tests showed that RIVIXIL is non-toxic and safe to use, arguing that the "safety" of a drug is a determination that only the FDA can make. Defendants again respond that RIVIXIL is not a drug, so that it can claim the product is safe without FDA approval.

Assuming that the safety claim is literally true, the Court nonetheless finds that the claim creates a deceptive impression about the product which would influence a consumer's decision to purchase it. Defendants rely totally on safety testing of RIVIXIL conducted by Kemyos. Only four of those tests involved humans rather than animals, and a total of 59 humans partici-

pated in them.[16] American consumers who see a product claiming that clinical tests have shown it safe for use expect that the product has gone through extensive and rigorous testing by the manufacturer, the government or both before its general sale. Kemyos' minimal testing of RIVIXIL hardly meets these expectations. A consumer's decision to buy RIVIXIL might be affected if he or she knew that the safety tests involved only 59 subjects. In addition, all of the Kemyos tests were conducted on the Italian version of RIVIXIL, which has a different concentration of minoxidil than the Riahom RIVIXIL product. The Italian tests therefore may be totally irrelevant as to the safety of the Riahom product. The Court concludes that defendants' claim that clinical tests have shown the safety of RIVIXIL is a deceptive statement covered by the Lanham Act. *See Vidal Sassoon, Inc. v. Bristol-Myers Co.,* 661 F.2d 272, 277–78 (2d Cir.1981) (finding violation where advertisement did not misstate results of testing but inaccurately stated how test was conducted and its results tabulated).

### d. HAIR GROWTH

Some of defendants' early advertising explicitly promoted RIVIXIL as a hair growth product. (A–141–42). Defendants' entire marketing approach left the unmistakable impression that their product promoted hair growth. (A–81). Defendants now advise the Court that RIVIXIL does not grow hair, but that it only promotes a fuller, thicker head of hair and nourishes the scalp.[17] They purportedly have removed all references to Upjohn's hair growth product and any representation that RIVIXIL grows hair. Nevertheless, defendants' dealers still say that RIVIXIL grows hair. Defendants' marketing materials still leave the unmistakable impression that their product promotes hair growth, and they contain no disclaimer re-

garding hair growth. The $150 price for a supply of RIVIXIL suggests that the product is supposed to do more than simply work as a hair conditioner.

In addition to literal falsehoods, § 43(a) of the Lanham Act "embraces 'innuendo, indirect intimations, and ambiguous suggestions' evidenced by the consuming public's misapprehension of the hard facts underlying an advertisement," *Vidal Sassoon, Inc.,* 661 F.2d at 277 (quoting *American Home Products Corp. v. Johnson & Johnson,* 577 F.2d 160, 165 (2d Cir. 1978)). The Court finds that the overall impression conveyed by defendants' advertising and promotional materials is that RIVIXIL grows hair. Given that defendants have argued strenuously in opposition to the patent infringement claims that RIVIXIL does not grow hair, their promotional materials make a false representation that is likely to deceive consumers. *See John Wright, Inc. v. Casper Corp.,* 419 F.Supp. 292, 327 (E.D.Pa.1976) (advertising makes no representation about country of origin but leaves total impression that product was manufactured in the United States), *modified on other grounds,* 587 F.2d 602 (3d Cir.1978).

For all the foregoing reasons, the Court concludes that Upjohn has shown a reasonable likelihood of success on the merits of its unfair competition claim.

### (ii) Irreparable Injury

To prove irreparable injury under § 43(a), a plaintiff need only provide "a reasonable basis for the belief that ... [it] is likely to be damaged as a result of the false advertising," *Johnson & Johnson v. Carter-Wallace, Inc.,* 631 F.2d 186, 190 (2d Cir.1980). No proof of actual sales diversion is required. *Id.* at 191.

---

**16.** Twelve people participated in a study of plasmatic concentrations of minoxidil (A–712–34), five people participated in a study of possible anti-hypertensive effects of SKM005 (A–735–846), and twenty-four people participated in a study of the tolerability area of RIVIXIL (A–898–927). The record also contains a synopsis of a test for allergic sensitivity involving 18 people (A–703–06).

**17.** Defendants have also referred to Upjohn's minoxidil product as promoting a thicker fuller head of hair, *see supra* note 10 and A–432–33.

Defendants' false and misleading claims about RIVIXIL definitely tend *to induce consumers to purchase their* product, thereby depriving Upjohn of potential customers and sales for REGAINE. In addition, consumers who purchase RIVIXIL because of defendants' false claims and who are dissatisfied with the product or injured by it may avoid REGAINE out of the assumption that all minoxidil-based hair products share the same shortcomings. Whatever the cause, defendants' deceptive claims will deny Upjohn part of the legitimate market for its patented discovery.[18]

Defendants' use of publicity about Upjohn and REGAINE to promote RIVIXIL tends to make the public think that some association exists between Upjohn and RIVIXIL. Upjohn will be injured if consumers attribute RIVIXIL to it and "this injury is by its very nature irreparable, since no payment of money damages in itself can abate the confusion." *Teledyne Indus. v. Windmere Products, Inc.*, 433 F.Supp. 710, 740 (S.D.Fla.1977); *see also U.S. News & World Report v. Campaigner Publications*, 222 U.S.P.Q. 123, 124 (D.D.C.1982) [available on WESTLAW, DCTU database]; *SK & F Co. v. Premo Pharmaceutical Lab.*, 625 F.2d 1055, 1066 (3d Cir.1980). The Court concludes that Upjohn has made a sufficient showing of irreparable injury.

#### (iii) Balance of Equities

The balance of equities greatly favors a grant of injunctive relief. Upjohn has spent approximately $100 million in research and development to prepare a topical minoxidil compound for the market. (A–17). It spent at least $25 million over the last three years for clinical studies relating to its NDA for REGAINE, in an attempt to comply with the applicable legal requirements for marketing a pharmaceutical product.

In contrast, defendants have invested next to nothing in the discovery and development of their product. They merely import a minoxidil concentrate from Italy and pay an independent packager to reformulate it. Defendants are thumbing their nose at United States drug regulations. They impudently assert that RIVIXIL is a "cosmetic" not subject to FDA regulation without ever having conducted any tests to determine whether the product lacks the attributes of a drug. They may also be misleading the public. Although defendants claim that RIVIXIL does not cause hair growth (and indeed, it may not), their promotional materials implicitly dangle the prospect of renewed hair growth in front of every balding person who sees them. The product either grows hair or it does not. As an equitable matter, defendants cannot have it both ways.

The only equity favoring defendants is that any grant of injunctive relief probably will have a serious adverse impact on their business. The relief contemplated by the Court should not destroy defendants' business because it will not prohibit defendants from selling RIVIXIL. The Court will require, however, that the product be marketed in a forthright manner in the future.

#### (iv) Public Interest

Granting a preliminary injunction against defendants' acts of unfair competition would serve the public interest. Defendants' promotional materials are deceptive and likely to confuse the public. "[C]us-

---

18. Upjohn still may obtain relief under the Lanham Act although REGAINE is not yet on the market (and may never be if it does not win FDA approval). *See Paramount Pictures Corp. v. Worldwide Entertainment Corp.*, 195 U.S.P.Q. 539 (S.D.N.Y.1977) (finding unfair competition in relation to poster for motion picture which had not been released at time of unfair acts); *Matsushita Elec. Corp. of America v. Solar Sound Systems, Inc.*, 184 U.S.P.Q. 406, 409, 381 F.Supp. 64 (S.D.N.Y.1974) (enjoining defendant's use of photograph of plaintiff's product, although product depicted in photograph was not sold in United States).

Similarly, a viable unfair competition claim can exist where the products do not compete directly because one is available over-the-counter and the other is available only by prescription. *See, e.g., American Home Products Corp. v. Morton-Norwich Products, Inc.*, 202 U.S.P.Q. 824, 826 n. 2 (S.D.N.Y.1978) (possibility of confusion between similarly named prescription birth control pill and over-the-counter suppository contraceptive).

**1226**

tomer confusion is by its very nature against the public interest." *Teledyne Indus.*, 433 F.Supp. at 740; *see also SK & F Co.*, 625 F.2d at 1067.

In addition, the public interest requires that defendants be more honest about the nature of their product. RIVIXIL's status as a drug or a cosmetic is not an issue before the Court at this time. Nevertheless, defendants should not be allowed to market RIVIXIL as a cosmetic, possibly endangering the public, without having conducted any tests to determine if the product is as ineffective in promoting hair growth as they claim and has no deleterious effects.

■ Taking into account each of the four factors discussed above, the Court finds that a preliminary injunction should issue prohibiting defendants' acts of unfair competition.

## IV. RELIEF

In light of the findings set out above regarding defendants' acts of unfair competition, the Court finds that several types of relief are appropriate. Defendants are enjoined in their packaging, advertising and promotional materials and in any other oral or written presentation from making the following representations either directly or by inference:

(a) that RIVIXIL or SKM005 is patented or that it contains a patented molecule;

(b) that RIVIXIL or SKM005 has been clinically or medically tested and proven safe and/or non-toxic for use;

(c) that RIVIXIL or SKM005 is a cosmetic;

(d) that RIVIXIL or SKM005 grows hair, retards hair loss, transforms one type of hair into another, or in any other way promotes hair growth.

Defendants also are prohibited, directly or by inference, from making any use of, or reference to, any publicity from television, periodicals or other sources about Upjohn, its REGAINE product, or the use of topical minoxidil compositions for the treatment of baldness. This prohibition shall include in-direct references, such as those found in defendants' dealer sales manuals or brochures. *See supra* note 10 and accompanying text.

■ The Court has concluded that defendants' current promotional materials deceptively suggest that the product grows hair, although the product supposedly does not have that effect. The Court has the equitable power to require a defendant who has engaged in acts of unfair competition to take affirmative steps to eliminate possible consumer confusion. *See, e.g., Paramount Pictures Corp. v. Worldwide Entertainment Corp.*, 195 U.S.P.Q. 539, 543 (S.D.N.Y.1977) (ordering defendant to redesign its movie poster); *B.H. Bunn Co. v. AAA Replacement Parts Co.*, 451 F.2d 1254, 1269–70 (5th Cir.1971) (approving district court's grant of affirmative relief). Accordingly, to eliminate the possibility of confusion, the Court will require that all packaging, brochures and other literature about RIVIXIL disseminated to the public and all material prepared for use by defendants' sales staff include language that RIVIXIL does not promote hair growth, does not retard hair loss and is ineffective for the treatment of baldness. This language should be clearly noticeable by persons reading the package or materials.

■ Finally, the Court finds that a cancellation of any outstanding orders for RIVIXIL and a recall of defendants' product and offending promotional materials, pending their revision to comply with this Court's order, are appropriate. Imposition of a recall requirement and cancellation of pending orders are both within the broad powers of this Court as a court of equity. *See, e.g., Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 210 U.S.P.Q. 175, 179–81 (2d Cir.1981) (approving district court's recall requirement); *Matsushita Elec. Corp. of America v. Solar Sound Systems, Inc.*, 184 U.S.P.Q. 406, 410, 381 F.Supp. 64 (S.D.N.Y.1974) (cancelling orders taken during time misleading advertising used). Accordingly, defendants shall be required to recall all RIVIXIL and any

packaging and promotional materials for RIVIXIL now in the possession of Riahom's packagers, national sales managers or regional sales managers. In addition, defendants shall send a written notice to each of the customers from whom it has an outstanding order for RIVIXIL notifying them that the orders have been cancelled because defendants are unable to supply the product. Defendants or their agents are prohibited from soliciting any new orders until new packaging and promotional materials for RIVIXIL have been prepared.

An Order will enter in conformity with this Opinion.