The UPJOHN COMPANY, Plaintiff,

v.

MEDTRON LABORATORIES, INC.,
Anthony Imbriolo, and Dominick
J. Carlisi, M.D., Defendants.

No. 87 Civ. 5773 (SWK).

United States District Court,
S.D. New York.

Oct. 19, 1990.

418

Kenyon & Kenyon by Thomas L. Creel, Richard L. DeLucia, Stuart D. Sender, Richard S. Gresalfi, and Andrea H. Scheidt, New York City, and Robert A. Armitage and Lawrence T. Welch, Kalamazoo, Mich., for plaintiff The Upjohn Co.

Cooper & Dunham by Lewis H. Eslinger and William E. Pelton, New York City, for defendants Medtron Laboratories, Inc., Anthony Imbriolo and Dominick J. Carlisi, M.D.

### CORRECTED MEMORANDUM OPINION AND ORDER [1]

KRAM, District Judge.

This is an action for infringement brought by plaintiff The Upjohn Company ("Upjohn"), claiming that defendants' topical minoxidil formulation, MINOXIDIL PLUS, infringes two Upjohn patents on the topical use of minoxidil to treat male pattern baldness. The patents at issue are U.S. Patent No. 4,139,619 (" '619 patent") and U.S. Patent No. 4,596,812 (" '812 patent").

Presently before the Court is Upjohn's motion for a preliminary injunction to enjoin defendants from engaging in activities that allegedly infringe the '619 and '812 patents. Although defendants concede infringement, they have raised several possible defenses to validity and enforcement. In a previous opinion, familiarity with which is presumed, this Court denied defendants' defense based on the equitable doctrine of laches and ordered a hearing on the obviousness and fraud defenses to the validity or enforceability of the patents. This Court held a hearing on June 18, 19, 21, 25 and 27, 1990. The parties have submitted post-hearing briefs, post-hearing reply briefs, proposed findings of fact and subsequent letter briefs. The following background of the development of minoxidil and the '619 and '812 patent prosecutions is important in light of defendants' allegations of patent invalidity and unenforceability.

### BACKGROUND

The history of minoxidil research dates to the late 1950's, when Upjohn began to experiment with a compound used in the production of plastics, in pursuit of a medication for the treatment of ulcers. Although its effect as an ulcer treatment was not promising, this compound, n,n-diallyl melamine, was found to lower the blood pressure in dogs. Thus, Upjohn began to research the efficacy of using this or similar compounds as a potential antihypertensive medication. After screening and synthesizing over 200 compounds of similar chemical structure, Upjohn synthesized the compound "minoxidil" in 1963.

In 1967, Upjohn filed an Investigational New Drug ("IND") application with the Food and Drug Administration ("FDA") to study minoxidil as an anti-hypertensive agent in humans. Thereafter, an Upjohn consultant and clinical pharmacologist and cardiologist, Dr. Charles A. Chidsey, began research for Upjohn at the University of Colorado where he served as a professor. Consistent with industry custom, Chidsey signed an agreement whereby he was obligated to assign to Upjohn any inventions that he made while working as a clinician on minoxidil.

In early 1971, Chidsey discovered increased hair growth (known as "hypertrichosis") on patients who took oral doses of minoxidil. Dr. Chidsey consulted with an endocrinologist who advised him after testing that the observed hair growth was not the result of abnormal endocrine function. Following this consultation, Chidsey concluded that the systemic, orally adminis-

---

**1.** This "corrected opinion" merely corrects a typographical error in footnote 9 of the October 12, 1990 opinion (footnote 10 of this opinion) to reflect that the Court had found that Medtron, not Upjohn, had failed to meet its burden to prove inequitable conduct.

tered minoxidil was the active agent causing the hair growth. Chidsey further noted that this conclusion was consistent with his observation of hypertrichosis in a patient he had earlier treated with minoxidil. Chidsey then reported this finding to Upjohn Doctors Zins and Freyburger.

At around this time, Chidsey consulted with a dermatologist, Dr. Kahn, and his medical resident, Dr. Grant, to better understand the characteristics of minoxidil's hair growing capability. According to Dr. Chidsey, he had reported his discovery that minoxidil caused hypertrichosis to Upjohn prior to his consultation with Drs. Kahn and Grant. In this initial consultation, Chidsey explained to Dr. Kahn how minoxidil affected various organs of the body. As a vasodilator, he explained, it increased blood flow to the various organs, including the skin. Their discussions also covered the functions of the body involved in hair growth.

In Spring 1971, an attorney in Upjohn's patent law department, James Killinger, began to draft the Chidsey patent application ("Chidsey application"), which was filed on December 29, 1971. In connection with the application, Chidsey signed an oath that he believed himself to be the original, first and only inventor of the topical use of minoxidil as a treatment for male pattern baldness. Apparently in light of the many ineffective treatments for baldness peddled throughout history, Upjohn had difficulty convincing the patent examiner of utility, *i.e.*, that minoxidil had some therapeutic value. Four successive applications were denied before the patent examiner found that Upjohn's fifth application satisfied the requisite showing of utility. Accordingly, the '619 patent issued on February 13, 1979.

The dermatologists consulted by Chidsey, Drs. Kahn and Grant, also claimed to be the inventors of topical minoxidil. In May or June, 1971, Kahn asked for and received some minoxidil from Chidsey's assistant, Dr. Gottlieb. Kahn and Grant applied a topical minoxidil solution to their own forearms, as well as to two other individuals, and observed increased hair growth. This initial Kahn and Grant test

on humans was not authorized by the FDA, as they had not applied for an IND. The parties to this litigation have agreed that Upjohn began working on the Chidsey patent application before Kahn and Grant did any work applying minoxidil topically. *See* Medtron's Request for Admission No. 177, admitted by Upjohn (quoted in Letter of Thomas L. Creel to the Court dated August 21, 1990).

Seeking some remunerative participation in the development of topical minoxidil, Kahn and Grant requested a meeting with Upjohn. Accordingly, they met with at least one Upjohn patent attorney and several scientists assigned to its hypertension project team, which was the Upjohn group assigned to work on minoxidil. At this meeting, Kahn and Grant generally discussed their work with topical minoxidil, disclosing that they had successfully grown hair on human beings through the topical application of minoxidil. According to Dr. Grant, they did not at that time disclose the details of their experiment. Kahn unequivocally stated that he wanted fortune, not fame, and that it would be reasonable for Kahn and Grant to receive between two and four percent of the sale of all products marketed by Upjohn that included topical minoxidil. Upjohn did not acquiesce to this request.

Kahn and Grant then hired an attorney, John E. Reilly, who again sought a two to four percent royalty participation in any future topical minoxidil products. In response, Upjohn advised

> Upon reviewing the facts available to us it is the conclusion of the Patent Law Department that Doctor Chidsey is the first and sole inventor of the claimed subject matter of a patent application now pending before the Patent Office. Should Doctor Kahn believe himself to be the first and sole inventor in the use of U–10,858 [minoxidil] in promoting hair growth, we would wish priority to be determined by an interference proceeding within the Patent Office.

Thereafter, Kahn and Grant filed their patent application on May 17, 1974. This application disclosed knowledge of another drug, diazoxide, that caused hair growth

resulting from systemic administration. In connection with this application, Kahn and Grant each signed an oath that they were the "original, first and joint inventors of the invention." Hearing Transcript ("Tr.") at 282. Just as the Chidsey application excluded Kahn and Grant, their application did not include Chidsey as a joint inventor.

Kahn and Grant also had difficulty convincing the patent examiner of utility and safety. Their first application was denied on these grounds pursuant to 35 U.S.C. § 101, as well as on others, and the examiner explained:

> [a]pplicants alleged that their compositions and method are capable of "arresting and reversing male pattern baldness." These are incredible allegations of utility. Moreover, since the active ingredient herein claimed is a potent blood pressure lowering agent, the safety of the same is queried in persons who do not have elevated blood pressure.

Plaintiff's Proposed Findings of Fact at ¶ 95 (citing Plaintiff's Exhibit 6a, at 21–23; Tr. at 283). Kahn and Grant amended their application on December 18, 1975, responding to the patent examiner's grounds for rejections. The claims of this amendment were also rejected by the examiner in April 1976. Like Upjohn, Kahn and Grant persevered and filed successive applications that were again denied by the examiner. Kahn and Grant appealed the denial of their second application to the Board of Appeals, which affirmed and explained:

> Appellants thus are not categorically precluded from obtaining a patent on the claimed invention, but in order to receive a patent grant thereon convincing factual evidence must be presented which refutes the commonly accepted fact that alopecia cannot be treated.... Appellants' evidence does not meet the criterion of clear and convincing evidence which is required to rebut the presumption of inoperativeness of the claimed invention.

Plaintiff's Proposed Facts at ¶ 104 (citing Plaintiff's Exhibit 6b at 68, 117–19; Tr. at 288.

Kahn and Grant's third application was filed as a continuation of the second application on August 28, 1980. As with its predecessor applications, it was denied for lack of demonstrated utility, as well as other grounds. On February 1, 1982, Kahn and Grant informed the PTO, through their attorney, that the '619 Chidsey patent appeared to disclose and claim the same subject matter as their application. Kahn and Grant thereafter sought an interference proceeding to determine priority as between their application and the Chidsey patent.

In an amendment filed with the PTO on August 2, 1983, Kahn and Grant stated that they had disclosed the results of their topical tests on minoxidil to Chidsey and Upjohn before the filing date of the '619 patent.[2] They charged Upjohn with unclean hands, as follows:

> a) They [Upjohn] solicited and obtained information about the invention from applicants without disclosing to applicants that Chidsey III or the Upjohn Company claimed any prior rights to the invention OR they used such information about the invention to prepare and file a patent application in the name of Chidsey III knowing that Chidsey III was not the first and original inventor.

> b) The Upjohn Company never informed the PTO that there was an adverse claim of prior invention by the applicants even though the Upjohn Company relied upon the publication of the work of the applicants to establish utility for the invention.

Defendants' Proposed Facts at ¶ 53 (citing Defendants' Exh. 40). In support of declaring an interference, Kahn and Grant also submitted declarations of Kahn, Grant and Gottlieb, which stated that they believed that Kahn and Grant discovered topical minoxidil before Upjohn. Finally, on March 14, 1984, the PTO declared an interference between the '619 Chidsey patent and the Kahn and Grant application.

Shortly thereafter, the parties entered into a settlement. On October 1, 1984,

---

**2.** Upjohn contends that Attorney Killinger began to work on the patent application before Kahn and Grant did their testing of a topical minoxidil solution.

Upjohn also entered into an agreement with Dr. Chidsey, whereby he would receive a royalty notwithstanding his assignment of any minoxidil discoveries to Upjohn. Under these agreements, Upjohn would pay substantial royalties to Kahn, Grant and Chidsey on each sale of topical minoxidil, regardless of who would ultimately be named as the inventor.

The parties further agreed to cooperate in the presentation to the PTO of all facts known to them regarding inventorship. An outside patent counsel was hired to complete an investigation of inventorship, and the PTO was apprised of this as follows:

> The parties to this interference have entered into a Settlement Agreement that will, it is believed, simplify and expedite the resolution thereof. As part of the settlement process, inventors of both parties and potential witnesses have been and are being interviewed by outside counsel in order to determine the pertinent facts and make recommendations with respect thereto.

Plaintiff's Proposed Facts at ¶ 121 (citing Plaintiff's Exhibit 96 at 19; Tr. at 293). Based on these investigations, Upjohn moved before the PTO to correct inventorship.

Although the decision as to who were the proper inventors was the domain of the PTO, Upjohn suggested three alternatives: (1) Dr. Chidsey alone; (2) Drs. Chidsey and Kahn jointly; or (3) Dr. Kahn alone. Plaintiff's Proposed Facts ¶ 123 (citing Plaintiff's Exhibit 96 at 130–61, 175–206, 207–38, 270–301). The PTO granted this motion to change inventorship on the '619 patent and '812 application to Chidsey and Kahn, as joint inventors.[3] Upjohn then agreed to file a terminal disclaimer in the '812 patent application, whereby the '619 and the '812 patents expired at the same time. The original Kahn and Grant application was finally granted on June 24, 1986, as the '812 patent in the names of the Drs. Chidsey and Kahn.

Prior to marketing a topical minoxidil solution, Upjohn needed approval from the Food and Drug Administration ("FDA"). The lengthy approval process began with an IND and approximately nine years of testing topical minoxidil in double-blinded placebo controlled trials. These studies were focused on determining the types of hair deficiencies for which a topical minoxidil solution would be useful, the appropriate concentrations of its ingredients, and the ultimate formulation that would be safe and reliably manufactured free from impurities. Tr. 69–72, 75–77.

In December 1985, Upjohn summarized the evidence from these studies in its New Drug Application ("NDA") for its ROGAINE solution of topical minoxidil. The NDA consisted of over 70,000 pages of data plus 170,000 pages of patient case reports. It included data from five nonclinical toxicology studies, twenty pharmacokinetic-bioavailability studies, sixty clinical studies and an additional sixteen studies addressed to safety. Plaintiff's Proposed Facts at ¶ 132 (citing Plaintiff's Exhibit 22 at 9–11; Tr. at 75). According to Upjohn, it cost over $100 million to develop and test topical minoxidil prior to its final approval, in 1988, of the formulation marketed as ROGAINE.[4] ROGAINE continues to be the only topical minoxidil solution approved as safe and effective by the FDA for the treatment of male pattern baldness.

## DISCUSSION

Plaintiff seeks an injunction under § 283 of the patent statute to enjoin Medtron from continued infringement of the '619 and '812 patents. 35 U.S.C. § 283.[5] The law of the Court of Appeals for the Federal Circuit governs the deter-

---

3. Pursuant to 35 U.S.C. § 116, Dr. Chidsey was added as a named inventor on the application originally filed by Drs. Kahn and Grant, and Dr. Grant was removed from it. Dr. Kahn was added to the '619 patent pursuant to 35 U.S.C. § 256. Both sections require a finding that the error made in the naming of inventors have been not the result of deceptive intent.

4. Rogaine is 2% minoxidil in a solution of 60% ethanol, 20% propylene glycol and 20% purified water.

5. This section merely provides in relevant part for the issuance of an injunction to enjoin "the violation of any right secured by a patent, on such terms as the court deems reasonable." 35 U.S.C. § 283.

mination of whether a preliminary injunction should issue under 35 U.S.C. § 283. *See, e.g., Hybritech Inc. v. Abbott Laboratories,* 849 F.2d 1446, 1451 n. 12 (Fed.Cir. 1988). This Court must consider four factors in its analysis, each of which should be weighed against the others and none of which is controlling: (1) a reasonable likelihood of success on the merits; (2) irreparable harm; (3) the balance of hardships between the parties; and (4) the public interest. *Id.* (citing *T.J. Smith & Nephew v. Consolidated Medical Equip., Inc.,* 821 F.2d 646, 647 (Fed.Cir.1987)); *H.H. Robertson Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 387 (Fed.Cir.1987); *Roper v. Litton Systems, Inc.,* 757 F.2d 1266, 1270–73 (Fed.Cir.1985). The movant has the burden of satisfying the first two factors. The first factor typically requires a two-part showing, as "a patent holder must establish a likelihood of success on the merits both with respect to validity of its patent and with respect to infringement of its patent." *Hybritech, supra,* 849 F.2d at 1451 (citing *T.J. Smith & Nephew, supra,* 821 F.2d at 647). If the patent assignee, here Upjohn, makes a strong showing of validity and infringement, then the law presumes irreparable harm. *Id.* at 1456; *H.H. Robertson, supra,* 820 F.2d at 390; *Roper, supra,* 757 F.2d at 1271–72; *Smith Int'l v. Hughes Tool Co.,* 718 F.2d 1573, 1581 (Fed. Cir.), *cert. denied,* 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983).

In *Hybritech,* as an example, the Federal Circuit affirmed an injunction enjoining defendant's sale of most but not all infringing products. The movant in *Hybritech* was in the business of developing diagnostic test kits capable of detecting a broad range of conditions, including pregnancy, cancer, growth hormone deficiency and hepatitis. The *Hybritech* movant, as assignee of a patent relating to these test kits, sought to preliminarily enjoin the defendant from producing allegedly infringing kits. The Federal Circuit found that the district court had not abused its discretion in finding that the movant, Hybritech, would prevail on validity regardless of a pending interference proceeding in

which another applicant claimed to be the prior inventor. *Id.* at 1452.[6]

*Hybritech* also clarified that weighing the four factors does not require a court to find that the equities balance in favor of the movant to grant the injunction. Indeed, *Hybritech* upheld the injunction even though the lower court had found that "neither party has a clear advantage" with regard to relative hardships. *Id.* at 1458. The *Hybritech* decision also sheds light on the importance of the public interest factor in some cases, as it upheld an injunction enjoining most of the infringing products but not infringing cancer and hepatitis test kits. The Court upheld the lower court's reasoning that the availability of these tests best served the public interest. *Id.*

This Court now considers, in turn, the likelihood of success, irreparable harm, the balance of hardships and the public interest. Defendants here concede infringement, but contend that the '619 and '812 patents are both invalid and unenforceable due to obviousness and fraud. Validity and enforceability are central to this Court's analysis of Upjohn's likelihood of success on the merits.

## I. Likelihood of Success on the Merits

Since infringement has been conceded, this Court considers first whether Upjohn has satisfied its burden to show a reasonable likelihood of success on the issue of patent validity. Medtron cites to and borrows from the *Riahom* opinion of the United States District Court, District of Delaware, which denied a preliminary injunction for infringement of the '619 patent. *The Upjohn Co. v. Riahom Corp.,* 641 F.Supp. 1209 (D.Del.1986). At the time of the *Riahom* decision, ROGAINE had not yet been manufactured and had not received FDA approval. Contrary to the present, there was little evidence of industry acquiescence to the validity of the patents. *Id.* at 1218. That Court further concluded that the record of validity before it at that time was sparse and that it would be typical to have

---

**6.** The Federal Circuit also found no abuse of discretion on literal infringement and the remaining validity issues, including the lower court's reliance on a prior adjudication of validity.

more discovery and hearings before such a patent injunction issues. Finally, the Court clarified that its declination to enjoin defendants stemmed from the undeveloped state of the record, and "does not mean that the Court has found any of the invalidity arguments advanced by defendants particularly convincing." *Id.* at 1219. The record before this Court is now more fully developed through extensive discovery and hearing, and this Court can now consider the question of validity based on that record. Medtron's arguments with regard to enforceability shall be considered after those relating to validity.

## A. Patent Validity

■ It is axiomatic, that "[a] patent is born valid" and remains such until "a challenger proves it was stillborn or had birth defects, or it is no longer viable as an enforceable right." *Roper, supra,* 757 F.2d at 1270. According to the patent statute, 35 U.S.C. § 282,

> A patent shall be presumed valid ... [T]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

*Id.* To defeat this presumption, Medtron must carry its burden by clear and convincing evidence. *Jones v. Hardy,* 727 F.2d 1524, 1528 (Fed Cir.1984).

### 1. Non-obviousness

■ Section 102 of the patent statute generally requires that an invention must be novel and not abandoned, and section 101 requires a showing of utility. 35 U.S.C. §§ 101, 102. More than mere novelty and utility, however, is needed before the law confers the benefits of a patent. Section 103 specifies that even novel and non-abandoned inventions are not patentable

> if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains ...

35 U.S.C. § 103. Medtron here argues that these patents are invalidated because the topical application of minoxidil would have been obvious to "a person having ordinary

skill in the art" at the time of Chidsey's discovery in early 1971.

In *Graham v. John Deere Co.,* the Supreme Court clarified that the question of non-obviousness under section 103 depends on a factual determination of (1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, (3) the level of ordinary skill in the art, and finally, (4) any objective evidence of non-obviousness, such as commercial success or long-felt but unresolved needs and failure of others. 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966). *See also In re O'Farrell,* 853 F.2d 894, 902 (Fed.Cir.1988) (applying *Graham* factors); *Custom Accessories, Inc. v. Jeffrey–Allan Industries,* 807 F.2d 955, 958 (Fed.Cir.1986) (same). The Supreme Court in *Graham* was confronted with the issue of whether the "Clamp for vibrating Shank Plows," a combination of old mechanical elements to create a device designed to absorb shock from plow shanks, satisfied the non-obviousness requirement. The Court considered five earlier prior art patents and concluded that the improvement of creating greater flex in the device was such an obvious development that "a person having ordinary skill in the prior art ... would immediately see that the thing to do was what Graham did, i.e., invert the shank and the hinge plate." *Graham, supra,* 383 U.S. at 25, 86 S.Ct. at 697.

### Scope and Content of Prior Art

Medtron argues that diazoxide, an antihypertensive drug developed by the Schering Corporation, is prior art. Schering developed diazoxide prior to the development of minoxidil. Tr. 93. Diazoxide, however, was never widely used or approved for use as a topical treatment for baldness. Diazoxide was known by some researchers, when orally administered, to grow large amounts of hair on the bodies of children as a side effect. Tr. 441; Defendants' Exhibits 78, 79, 80 and 88. Medtron contends that the differences between diazoxide and minoxidil are not significant. Medtron focuses on their similarities: both are powerful antihypertensive agents that work as vasodilators. Tr. at 94. Medtron further

argues that the chemical structure of the two drugs appears similar, but this is refuted by Upjohn.

On the issue of prior art, Medtron called several doctors who had experimented with diazoxide. Dr. Lester Baker, a pediatrician, used diazoxide before Chidsey's discovery to treat low blood sugar in children, as it also elevates blood sugar levels as a side effect. According to Baker, all of the children to whom he orally administered diazoxide experienced some increased hair growth, while half of them experienced dramatic hair growth. Tr. 523. Baker consulted with Dr. Peter J. Koblenzer, a dermatologist, as to the cause for the unsightly hair growth. Dr. Koblenzer and a neurologist and colleague, Dr. Samuel H. Tucker, applied a topical solution of diazoxide to their bald scalps to see if it would grow hair. Some hair was grown on Tucker's head as a result of these tests, but the experiment was discontinued as the results were of only limited cosmetic value and the doctors were concerned about the safety of the experiment.

Baker and Koblenzer reported the observed hypertrichosis to Schering and received a grant of $1,750.00 from that company to perform biopsies on the children that had exhibited hair growth resulting from the oral administration of diazoxide. Tr. 529 Schering, however, did not provide any further research assistance. Baker and Koblenzer also unsuccessfully sought the financial assistance of Carter Wallace Laboratories.

Prior to the Chidsey discovery, Baker and Koblenzer published two papers that discussed the side effect of hair growth when diazoxide was orally administered to children. Defendants' Exhibits 47 and 48. These articles discussed the problem of the hypertrichosis, but did not explicitly suggest topical application of diazoxide as a baldness treatment. Furthermore, Drs. Baker and Koblenzer did not publish or otherwise publicly disseminate the results of their topical test. Tr. 434, 483. Dr. Koblenzer apparently stored the results of these tests in a safe deposit box where they remained from the late 1960's until recently. Tr. 543, 484, 457–58.

On the scope of prior art, Upjohn persuasively argues that the topical application of diazoxide by Drs. Baker, Koblenzer and Tucker cannot be prior art for purposes of § 103. Only prior art that falls within the subparagraphs of 35 U.S.C. § 102 can be considered as prior art with respect to the non-obviousness analysis of § 103. *In re McKellin*, 529 F.2d 1324 (CCPA 1976) (cited in 2 D. Chisolm, *Patents*, § 5.03[3] at 5–160 (1990)). The topical use of diazoxide cannot be prior art because it was not patented, published or publicly used or sold, but instead was kept secret by Dr. Koblenzer. The Baker and Koblenzer topical diazoxide tests cannot be prior art because their results were not published or otherwise publicly disseminated. *Continental Oil Co. v. Cole*, 634 F.2d 188, 195–96 (5th Cir.) (document with important disclosure not "prior art" because it was privately submitted to corporate patent department and did not become public), *cert. denied*, 454 U.S. 830, 102 S.Ct. 124, 70 L.Ed.2d 106 (1981); *Stamicarbon, N.V. v. Escambia Chemical Corporation*, 300 F.Supp. 1209, 1215 (N.D.Fla.1969) ("secret uses which are not publicly known or disclosed do not constitute 'prior art' under the provisions of 35 U.S.C. §§ 102 and 103"), *aff'd as modified*, 430 F.2d 920 (5th Cir.), *cert. denied*, 400 U.S. 944, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970); *cf. Massachusetts Institute of Technology v. AB Fortia*, 774 F.2d 1104, 1109 (Fed.Cir.1985) (document was prior art because its distribution to six interested persons was without restriction and its oral presentation to between 50 and 500 persons of ordinary skill in subject matter constituted publication under § 102).

Dr. Frank Finnerty, a cardiologist, also testified for Medtron on the issue of whether diazoxide should be considered within the scope of prior art. His work involved the use of diazoxide to treat patients suffering from hypertension. Tr. 491–499. Finnerty never tried diazoxide topically, *see* Tr. 503, and he did not report its side effect of hair growth to Schering, his sponsor for diazoxide research. Finnerty also later served as a researcher for Upjohn with minoxidil, at which time he also observed hair growth from the oral administration of

minoxidil and told Upjohn that he had previously seen hair growth with orally administered diazoxide.

In 1973, Finnerty authored a chapter for a book in which he summarized his treatment of approximately 600 patients over ten years with orally administered diazoxide. This summary did not mention hair growth as a side effect, nor did any other writing of his of which this Court is aware. This may be explained by the fact that hair growth in adults who were orally administered diazoxide was minimal compared to that occurring from minoxidil. Tr. 503, 505. Furthermore, the article published by Dr. Koblenzer, see Defendants' Exhibit 48, mentioned that clinical tests of diazoxide as an antihypertensive drug indicated that only a 1% incidence of hair growth. Tr. 468.

### Differences Between Prior Art and Claims of Topical Minoxidil

The Court notes that minoxidil is most effective as a treatment in reversing male pattern baldness before the patient goes completely bald. It is not a cure. Nonetheless, it represents a dramatic departure from any prior art, diazoxide included. No prior art claimed to be a safe and effective treatment for male pattern baldness. The only prior art cited as relevant by the PTO were the original patents on minoxidil as an anti-hypertensive agent (the "Anthony et al. patents"). These patents, also owned by Upjohn, did not disclose the topical hair growth compositions of the '619 and '812 patents.

While it was reported by Koblenzer that systemic, oral doses of diazoxide resulted in hair growth as a side effect, the only evidence of prior topical application of diazoxide was not published. Moreover, those results did not suggest either a safe or effective treatment. Even if Koblenzer's articles on oral administration were considered prior art, this prior art differs drastically from the '619 and '812 patents, which claim a safe and effective topical treatment for male pattern baldness.

### Level of Ordinary Skill

The Court must decide who is the proverbial person having ordinary skill in the art "when the invention was unknown and just before it was made." *In re Fine*, 837 F.2d 1071, 1073 (Fed Cir.1988). The Federal Circuit has explained that

> [t]he primary value in the requirement that level of skill be found lies in its tendency to focus the mind of the decisionmaker away from what would presently be obvious to that decisionmaker and toward what would, when the invention was made, have been obvious, as the statute requires, 'to one of ordinary skill in the art.'

*Kloster Speedsteel AB v. Crucible Inc.,* 793 F.2d 1565, 1574 (Fed Cir.1986), *cert. denied,* 479 U.S. 1034, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987). That "person of ordinary skill is charged with knowledge of the entire body of technological literature, including that which might lead away from the claimed invention." *In re Dow Chemical Co.,* 837 F.2d 469, 473 (Fed.Cir.1988).

There are many levels of skill in the art of treating baldness, from the proverbial "snake oil salesman" to the members of Upjohn's Hypertension Project Team who held Ph.D.'s in either pharmacology or chemistry, or were medical doctors. No prior safe and effective treatment for baldness existed; consequently, it is difficult to say who possessed normal skill in the art. The Court declines to find, as Upjohn suggests, that the defendant Imbriolo is one of ordinary skill even though he lacks formal education in the sciences. In light of the purpose of this analysis, which is to focus this Court on an appropriate objective standard, the Court concludes that a person of ordinary skill would at least be a dermatologist or other medical doctor specializing in hair or skin problems in 1971.

### Objective Evidence of Non-obviousness

While the first three factors are of primary importance in the *Graham* analysis, this Court should also consider objective evidence of non-obviousness, where relevant. *Graham* identified some examples of objective evidence: commercial success, long-felt but unsolved needs, and the failure of others. *Graham, supra,* 383 U.S. at 17, 86 S.Ct. at 693. Here, Upjohn argues the following seven objective examples of evidence supporting non-obviousness: (1)

long-felt need for baldness treatment dating to ancient Egyptians; (2) failures with other substances, from testosterone to pigeon dung; (3) the unexpectedness of topical minoxidil's results; (4) topical minoxidil's accolades; (5) its commercial success; (6) Medtron's copying; and (7) industry acquiescence to Upjohn's patents. Medtron, on the other hand, contends that minoxidil is not very effective and that its commercial success is attributable to Upjohn's promotional and advertising efforts. Nevertheless, Medtron's advertisements refer to minoxidil as a "medical breakthrough." Regardless, the objective evidence of nonobviousness still lends some support to Upjohn.

This Court is well aware that obviousness does not require absolute predictability. *In re Dillon, supra,* 892 F.2d at 1570. "Obviousness, does, however, require some relationship between the use taught in the reference and the use discovered by the applicant." *In re Dillon, supra,* 892 F.2d at 1570. More typically, a reasonable expectation that the beneficial result will be achieved is enough to show obviousness. *In re Longi,* 759 F.2d 887, 897 (Fed.Cir. 1985).

■ Applying the *Graham* analysis, this Court concludes that topical minoxidil would not have been obvious to one skilled in the art just prior to Chidsey's discovery in 1971. Topical diazoxide cannot be prior art because it was not disclosed and would not have been known by one of ordinary skill in the art in 1971. A person of ordinary skill in the art, however, would be charged with knowledge of the Koblenzer articles on hair growth due to the oral administration of diazoxide. Avoiding hindsight, this Court cannot consider as prior art Chidsey's discovery of minoxidil's hair growth properties when orally taken. One of ordinary skill therefore would not know that minoxidil, like diazoxide, caused hair growth when systemically given. It follows that one of ordinary skill in 1971 would not have had a reasonable expecta-

tion that topical minoxidil would be a safe and effective treatment for baldness.[7]

### 2. Other Alleged Grounds for Invalidity

#### a. '619 Patent

Medtron argues that the '619 patent is invalid under 35 U.S.C. §§ 101 and 102(f) because of a problem in inventorship, although it is unclear who Medtron claims would be properly named as inventor. Medtron attacks the validity of the '619 patent on the ground that the change in inventors from Chidsey to Chidsey and Kahn did not comply with 35 U.S.C. § 256. In relevant part, section 256 states:

> Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the Commissioner may on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.

> The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section....

35 U.S.C. § 256 (1988). First, Medtron argues that there was no error in only naming Chidsey, as Upjohn's act in naming Chidsey and not Kahn back in 1971 was a deliberate act undertaken to benefit Upjohn with full knowledge of the relevant facts. If the original naming of Chidsey was not in error, Medtron argues that section 256 could not be used to change inventorship. In a related argument, Medtron contends that the original naming of Chidsey was with "deceptive intent."

■ In response, Upjohn first contends that the PTO's decision to amend pursuant to § 256 should not be disturbed by this Court, as that decision is due a presumption of correctness under the doctrine of administrative correctness. *American Hoist & Derrick Co. v. Sowa & Sons,* 725

---

7. This conclusion was supported by Upjohn's expert, Dr. Drake, who testified that doctors were taught in 1971 that there was no effective treatment for baldness. Tr. 140.

F.2d 1350, 1359–60 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). Clearly, however, a Court presented with evidence of deceptive intent would not merely defer to an erroneous PTO determination. Therefore, this presumption of correctness is rebutted when a challenger shows that material facts were omitted or misrepresented or that errors of law were made. *Kloster Speedsteel A.B. v. Crucible, Inc.,* 793 F.2d 1565, 1571 (Fed. Cir.1986), *cert. denied,* 479 U.S. 1034, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987).

■ Medtron charges that greed corrupted otherwise respectable Upjohn employees who decided to originally name only Chidsey because he had signed an assignment of the minoxidil invention. By naming only Chidsey, Medtron argues, Upjohn thought it would avoid sharing the fruits of this invention in the form of royalties paid to others. As these allegations are not inconsistent with human nature, Medtron has been given the opportunity to conduct extensive discovery, much of which on the inequitable conduct allegations. Medtron, however, did not present any specific evidence to support an inference of deceptive intent. It also has not presented evidence suggesting any material misrepresentation or omission before the PTO. Since Medtron has not satisfied its burden of showing that the PTO decision should not be accorded a presumption of correctness, it cannot undermine UpJohn's showing of a likelihood of success on this ground.[8]

### b. '812 Patent

■ Medtron also argues that the statute for amending pending applications, 35 U.S.C. § 116, was not complied with, as that statute also requires that the amendment be of an error and that the error not be the result of deceptive intent. Once again, the presumption of administrative correctness governs in the absence of ma-

terial facts supporting a finding that either no error was made or that the initial application by Kahn and Grant was the result of deceptive intent. In their original declarations, Drs. Kahn and Grant stated that they believed that they were the initial inventors; Kahn, however, changed that conclusion in his later declaration based, he claims, on a better understanding of the law of joint inventorship.

Contrary to Medtron's position, a deliberate act can be an error susceptible to correction under either sections 116 or 256. *In re Schmidt,* 293 F.2d 274, 277–79 (C.C. P.A.1961). Furthermore, an error may include mistakes in legal judgment as to who should be named or whether or not this was a joint invention. *Mueller Brass v. Reading Indus.,* 352 F.Supp. 1357, 1376 (E.D.Pa.1972), *aff'd,* 487 F.2d 1395 (3d Cir. 1973). Moreover, Medtron has not carried its burden of demonstrating, by clear and convincing evidence, that deceptive intent motivated the decision of Kahn and Grant to exclude Chidsey.

■ Medtron also argues that the '819 patent cannot share the Chidsey filing date (December 29, 1971) because Upjohn did not comply with 35 U.S.C. § 120. Section 120 provides that an application may be amended to contain a reference to an earlier filed application. Specifically, Medtron argues that section 120 would only permit the amendment of '812 to have the '619 filing date if (1) the inventive entities on each patent are the same and (2) the request for the filing date is made before the "patenting or abandonment of or termination of proceedings on the first application." 35 U.S.C. § 120.

The Court does not find that Upjohn failed to comply with section 120 of the patent statute. With regard to the first objection, the identity of inventors, the Court does not find fault with the PTO's permission to grant amendments pursuant

---

8. In a similar argument, Medtron contends that Chidsey could not be the inventor of topical minoxidil because he only observed the hair growth as a side effect, and that observation lacked patentable utility. *See, e.g.,* Letter to Court by Defendants' Attorney, dated September

10, 1990. However, that observation was an integral part of the invention and this Court cannot on this record find evidence that would undermine the PTO's finding that Chidsey's contribution should not accord him joint inventor status.

to §§ 116 and 256 that changed the inventive entities on the '619 patent and '812 application to Chidsey and Kahn, jointly. The amendment of inventors to create identity of inventive entities prior to amendment of filing date is not without precedent. *See Weil v. Fritz*, 572 F.2d 856, 861 (CCPA 1978); *Mueller Brass Co., supra*, 352 F.Supp. at 1378.

 As to Medtron's second objection, the Court first notes that both applications were co-pending from the filing of the '812 patent in 1974 until 1979, when the '619 patent was granted. Moreover, section 120 alternatively provides for changing the date, where the inventors are the same and where the second application is "similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application." 35 U.S.C. § 120. Since the '812 application was amended to reference the '619 patent and the claims and inventors are identical, the Court concludes that the '812 application was "similarly entitled" to the December 29, 1971 filing date. At a minimum, this Court does not find grounds to disturb the PTO's allowance of the change in filing dates.

### B. Patent Enforceability

 Medtron charges inequitable or fraudulent conduct by Upjohn and its employees in the procurement of the '619 patent. Medtron argues that these parties, corrupted by visions of a highly remunerative invention, materially misled the PTO with regard to prior art and inventorship. Additionally, Medtron contends that their conduct violated the duty of candor to the PTO, as set forth in subsection 1.56(a) of Title 37 of the Code of Federal Regulations. This section provides that a duty of candor and good faith towards the PTO rests on the inventor, on each attorney and on every other individual substantively involved in the preparation or prosecution of the application. 37 U.S.C. § 1.56(a). This duty includes the duty to disclose information of which they are aware and which is material to the examination of the application. *Id.* Information is material where there is a "substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *Id.*

Medtron first suggests that the Upjohn attorney who filed and prosecuted the '619 patent, James Killinger, fraudulently named Chidsey as sole inventor. Medtron also states that Killinger had to have known that Chidsey assigned his right under the patent. The defendants also contend that Killinger knew that Kahn and Grant wanted money for any assignment, and therefore, defendants suggest that Chidsey was named to avoid any future royalty obligations. This inequitable conduct also manifested itself, according to Medtron, in Upjohn's failure to disclose to the PTO the conflict between the two patent applications. Medtron similarly claims that the duty of candor was violated because Upjohn knowingly filed a an application without citing the actual inventor. Medtron also alleges that plaintiff failed to disclose diazoxide's effects when systemically administered, as that was prior art.

In response, Upjohn argues that it acted in good faith. It contends that Killinger made an innocent mistake in not naming Kahn as a joint inventor, that diazoxide was disclosed in an article repeatedly submitted to the PTO on the issue of utility,[9] and that Upjohn instructed Kahn and Grant to seek an interference to openly resolve the issue of priority.

Upjohn also cites to this Court authority for the proposition that the Federal Circuit discourages the inequitable conduct defense where it is based, as here, largely on supposition and inference. In *Burlington Indus. v. Dayco Corp.*, the Federal Circuit vacated and remanded a lower Court find-

---

**9.** This article, which appeared in the periodical *Dermatology in Practice,* was entitled "Experimental Vasodilating Agent [Minoxidil] Found Stimulating Hair Growth." Plaintiff's Exhibit 79. The article explicitly described the work of Drs. Kahn and Grant as evidence of utility, and it also disclosed that the antihypertensive drug diazoxide was known to stimulate hair growth when used systemically. *Id.*

ing of patent unenforceability due to the inequitable conduct of a patent attorney. 849 F.2d 1418 (Fed.Cir.1988). The *Burlington Indus.* Court scathingly commented that

> the habit of charging inequitable conduct in almost every major patent case has become an absolute plague. Reputable lawyers seem to feel compelled to make the charge against other reputable lawyers on the slenderest grounds, to represent their clients' interests adequately, perhaps. They get anywhere with the accusation in but a small percentage of the cases, but such charges are not inconsequential on that account. They destroy the respect for one another's integrity, for being fellow members of an honorable profession, that used to make the bar a valuable help to the courts in making a sound disposition of their cases, and to sustain the good name of the bar itself.

849 F.2d at 1422. Following this distressing commentary, the Court instructed that "[e]ven after complete testimony, the court should find inequitable conduct only if shown by clear and convincing evidence." *Id; see also Kingsdown Medical Consultants v. Hollister, Inc.,* 863 F.2d 867, 876 n. 15 (Fed.Cir.1988) (district court finding of deceitful intent was clearly erroneous; "[t]he habit of charging inequitable conduct in almost every major patent case has become an absolute plague"), *cert. denied,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989); *DuPont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1439 (Fed.Cir.) (" 'Fraud in the PTO' has been overplayed, is appearing in nearly every patent suit, and is cluttering up the patent system"), *cert. denied,* 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988); *In re Harita,* 847 F.2d 801, 808 (Fed.Cir.1988) (similar statement); *FMC Corp. v. Manitowoc,* 835 F.2d 1411, 1415 (Fed.Cir.1987) (same); *Kimberly–Clark Corp. v. Johnson & Johnson,* 745 F.2d 1437, 1454 (Fed.Cir. 1984) (same).

"[A] determination of inequitable conduct requires findings on materiality and intent." *FMC Corp. v. Manitowoc Co., Inc.,* 835 F.2d 1411, 1415 (Fed.Cir.1987). Therefore, "to be guilty of inequitable conduct, one must have intended to act inequitably." *Id.* A party asserting inequitable conduct by virtue of a "failure to disclose" must offer clear and convincing proof of:

> (1) prior art or information that is material; (2) knowledge chargeable to applicant of that prior art or information and of its materiality; and (3) failure of the applicant to disclose the art or information resulting from an intent to mislead the PTO.

*Id.* at 1415. The Court then explained that a patentee may rebut this proof by showing that the prior art was not material, or if material, by a showing that applicant did not know of that art. *Id.* at 1415. If the prior art is both material and known by the applicant, the applicant may then show that he did not know that it was material. *Id.* Finally, the patentee may also defeat allegations of inequitable conduct by "showing that applicant's failure to disclose art or information did not result from an intent to mislead the PTO." *Id.; see, e.g., In re Harita, supra,* 847 F.2d at 808 (no inequitable conduct where no evidence of misstatement in prosecution of patent and no evidence of deliberate scheming).

This Court has considered Medtron's allegations of inequitable conduct and concludes that Medtron has not met its burden of demonstrating such claims by clear and convincing evidence. The Court ordered the hearing in part because of the very serious allegations of misconduct by Upjohn, but the hearing did not produce such evidence. In fact, it has not presented much more than a motive—the avoidance of royalties—which is based on supposition. As the evidence does not approach proving by clear and convincing evidence that Killinger or other Upjohn employees, attorneys or agents acted with deceptive intent, Medtron's claims of inequitable conduct cannot provide a ground for undermining plaintiff's likelihood of success on the merits.[10]

**10.** As this Court does not find that Medtron has satisfied its burden to prove inequitable conduct

■ Medtron has conceded infringement and the Court has not credited defendants' purported defenses to infringement. The '619 and '812 patents are therefore presumed valid. *Datascope Corp. v. SMEC, Inc.*, 776 F.2d 320, 323 (Fed.Cir. 1985). After considering defendants' arguments on invalidity and unenforceability and determining that they have not proven these allegations by clear and convincing evidence, the Court now concludes that Upjohn demonstrated a reasonable likelihood of success on the merits.

## II. Irreparable Harm

Irreparable harm is presumed from a showing of patent validity and infringement. *Smith Int'l, supra,* 718 F.2d at 1581. The policy behind this presumption is to lessen a movant's necessary showing in light of the fact that a patent grant exists for a finite term and the lengthy process of patent litigation might otherwise "tempt infringers." *H.H. Robertson, supra,* 820 F.2d at 390.

The Court finds no compelling basis for not accepting the presumption of irreparable harm in this case. Additionally, the Court finds evidence of actual irreparable harm. Clearly, every sale by Medtron is a sale that Upjohn could reasonably expect to have had. Upjohn also argues that Medtron has publicly stated, and its balance sheets indicate, that it is insolvent. Consequently, Upjohn contends that money damages may not be a practical remedy. Upjohn also reminds the Court that Medtron has tried in the past to raise money in the stock market to permit substantial expansion. *See* Prospectuses, Plaintiff's Exhibits 29, 31. Although defendants are not a large business in comparison with Upjohn, their continued infringement, left unchecked, could conceivably encourage many others to infringe.

The Court also notes that defendants' formulation of minoxidil purportedly contains absorption enhancers to improve its effectiveness. In light of the potentially serious side effects of this powerful antihypertensive drug, it would be reasonable to be concerned that any serious side effects experienced by defendants' patients could irreparably damage consumer good will towards topical minoxidil products in general. Any erosion of such good will would most definitely injure Upjohn—the patent assignee who is also the only manufacturer of an FDA-approved safe and effective medicinal treatment for baldness. Even though one of the defendants testified that none of Medtron's customers had experienced dangerous side effects thus far, any occurrence of serious side effects in a Medtron patient would seriously harm Upjohn.

Based on the above analysis, this Court finds that Upjohn has satisfied its burden, which is to demonstrate the first two factors—likelihood of success on the merits and irreparable harm. *Hybritech, supra,* 849 F.2d at 1451. The Court now considers the remaining factors—balance of hardship and public interest—both of which also support an injunction.

## III. Balance of Hardships

This factor is easily analyzed. The Court has already found that Upjohn would face continued irreparable harm, should Medtron be permitted to continue its infringement during the remainder of this lawsuit. Faced with the question of the balance of hardships in the context of a permanent injunction, the Federal Circuit stated:

> One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected.

*Windsurfing Int'l v. AMF, Inc.*, 782 F.2d 995, 1003 n. 12 (Fed.Cir.), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565

---

in the prosecution of the '619 patent, this Court need not consider the argument presented by recent letters that inequitable conduct in connection with '619 may also provide grounds for the unenforceability of the '812 patent. *See* Letters by Lewis H. Eslinger dated July 31 and September 4, 1990 (discussing Federal Circuit opinion *Consolidated Aluminum Co. v. Foseco Int'l Ltd.,* 910 F.2d 804, dated July 19, 1990); Letter by Thomas L. Creel dated August 21, 1990 (discussing *Consolidated Aluminum* ).

(1986). Medtron's claim that it faces extinction, if this injunction were granted, may not be so, as Medtron could still purchase ROGAINE to treat its customers. Even if this were not economically practicable, the Court still concludes that hardship analysis cannot provide grounds for the defendants' continued infringement. The Court finds as a fact that substantial hardship faces either party if unsuccessful, but concludes in weighing the relative hardships that Upjohn is favored.

IV. Public Interest

As noted earlier, the Federal Circuit in *Hybritech* upheld a district court's conclusion that a manufacturer of testing kits should be preliminarily enjoined as to most of its products, but not as to its cancer and hepatitis tests, as the availability of those tests served the public interest. 849 F.2d at 1458. The public's interest in the availability of such testing devices, however, cannot even be compared to any interest that might exist in the availability of Medtron's cosmetic treatments. Instead, the most notable public interest lies in protecting the public from a potentially dangerous topical formulation.

While Medtron's formulation, MINOXIDIL PLUS, has not been shown to be dangerous, this begs the question of public interest. The public interest is in having all potentially unsafe drugs appropriately tested pursuant to FDA standards, which concededly has not been done with MINOXIDIL PLUS. Additionally, the Court cannot credit the testimony of Anthony Imbriolo, Medtron's founder, that MINOXIDIL PLUS is safe. Mr. Imbriolo is not a doctor, pharmacist, chemist, or even college graduate, and he has not done clinical testing for safety other than to maintain records on Medtron's patients.

## CONCLUSION

For the aforementioned reasons, the Court grants Upjohn's motion for a preliminary injunction. Medtron Laboratories, Inc., Anthony Imbriolo and Dominick J. Carlisi are preliminarily enjoined from manufacturing, selling or otherwise distributing the infringing product, MINOXIDIL PLUS, during the pendency of this litigation.

SO ORDERED.